CITY OF CAMDEN, complainant,

*v.*

WEST JERSEY AND SEASHORE RAILROAD COMPANY et al.,
defendants.

[Decided February 8th, 1924.]

1. A city ordinance authorizes the construction and operation of a steam railroad longitudinally over a public street. *Held*, the ordinance does not confer upon the railroad company a right to store engines and cars and make up and break up trains on said street in the ordinary course of its business. The right conferred is merely to use the street for the purposes of a way, and not as a station-yard.

2. The inability of the railroad company to discharge its duties to the public if compelled to immediately discontinue the use of a public street for station-yard purposes may be made the ground of a judicial ascertainment of the earliest time at which its unlawful use of the street can be wholly discontinued without unnecessary injury to its public service, to the end that restraint may be withheld during the intervening period of active readjustment of terminal operating facilities.

On final hearing on bill for injunction.

*Mr. Howard L. Miller,* for the complainant.

*Messrs. Bourgeois & Coulomb,* for the defendants.

LEAMING, V. C.

The bill of complaint filed herein seeks to restrain defendant company from using a highway in Camden, known as Main street, in the operation of its steam railroad, as a station-yard or for terminal purposes, and from storing engines and cars and making up and breaking up trains on said highway.

There appears to be no substantial dispute in this case touching the essential facts.

The Camden and Atlantic Railroad Company, predecessor in title of defendant, was incorporated by act of the legislature of March 19th, 1852. *P. L. 1852 p. 263.* By that act the corporation was authorized to construct a railroad from Camden to Atlantic City over a route to be located by it.

No authority of the corporation to construct its railroad along and across streets in the city of Camden was conferred by that act. That authority was conferred by an ordinance of that city, passed February 12th, 1853. Defendant contends that that ordinance confers upon it authority to operate its railroad on and along Main street in the manner here complained of by complainant.

I find nothing in that ordinance which can be said to confer upon the railway corporation, either expressly or by inference, any rights or privileges in the use of Main street other than to use that street for the ordinary purposes of a way. Nothing in that ordinance even remotely suggests the use of that street or its several street intersections for purposes of a station, a station-yard, or a terminal. The language of the ordinance is: "That the Camden and Atlantic Railroad Company be authorized to construct their said railroad along and across said streets, upon the said route as described and delineated in said petition and accompanying map." The petition there referred to is recited in the preamble of the ordinance as a petition of the Railroad Company to the city of Camden "to grant their permission to construct their said railroad along, over and across certain streets in said city, to wit: Commencing at a point and in the river Delaware at Coopers Point, near to and south of the ferry at said point, and there crossing river road on Water street and Front street, to a point in Main street at or near its junction with Vine street; thence along said Main street to a point in said Main street between Sixth and Seventh streets; thence curving to the right and crossing Seventh, Penn, Eighth, Cooper, Ninth, Market and Federal streets to the city line, near its junction with the Haddonfield turnpike."

It will be observed by reference to the large map produced by defendant that this route begins in what is now commonly known as the terminal or freight yard of defendant and extends thence in an easterly direction and curves on to Main street at about its intersection with Vine street, first crossing several intermediate streets, and then extends longitudinally along Main street several blocks, crossing Second, Third, Fourth and Fifth streets, and then curves to the right from Main street at about Sixth street, and then crosses a number of streets to the city line; in all a great distance, but not shown in its entire length on the map above referred to. It seems impossible to contemplate this grant as a grant for the use of the several streets and street crossings for station-yard or terminal purposes, or as anything more than a grant of the use of the several streets and street crossings for purposes of a way, and thus rendering the route theretofore adopted by the railway corporation pursuant to the requirements of its charter available for the company. As said by Mr. Justice Dixon in *Pennsylvania Railroad Co.* v. *Angel, 41 N. J. Eq. 316* (at *p. 328*): "The primary privilege given is that of passage; this and its reasonable incidents cover the whole scope of the grant. The right of storing engines and cars, either for a longer or shorter period; the right of making up and breaking up trains, are not embraced in such a concession. These are strictly station and terminal purposes, and by providing for station-yards the legislature has indicated its intention that business of that nature should be transacted there." It will be noted that section 13 of the charter act of the railroad company specifically authorized the company "to purchase, have and hold real estate at the termini of its road and at intermediate depots upon the line of the same, not exceeding five acres at each place, and may erect and build thereon such houses, warehouses, machine shops, and other buildings and improvements as they may deem expedient for the safety of property and the construction and repairing of cars, carriages. steam engines and for other necessary uses." And by legislative act of February 26th, 1855, cited in the *Angel Case,*

already referred to, the company was authorized to acquire additional land for similar purposes.

But the contention of defendant herein is that the ordinance contains certain specific features which bestowed upon the railroad company rights in the use of the streets and street crossings for purposes other than as a way.

By the second section of the ordinance the authority granted "to construct their said railroad along and across said streets upon said route," as contained in the preceding section, is defined to be upon the express condition that the company shall procure Main street to be widened twenty feet on each side, as set forth in the preamble of the ordinance, and shall also bear the expense of paving and grading as well as certain other burdens. The widening of Main street appears to have been accomplished by a deed of dedication to the public for street purposes of twenty feet on either side of Main street, and it may be here assumed that the company fully performed the other burdens imposed by the ordinance. The argument now urged is that this widening of Main street and the location of tracks in its centre in effect made two streets of Main street—one on either side of the railroad—and vacated that part in the centre of Main street which is occupied by the railway tracks. This view is clearly untenable. Streets are not vacated in that manner; and the same view, if adopted, would be operative to vacate the several streets crossing Main street at the points of crossing. I find nothing in the ordinance to indicate an intent upon the part of the city to grant by the ordinance more than the use of Main street and the several street crossings for the purposes of a way, and nothing to indicate an intent to grant the use of that street and the several street crossings as a station-yard.

As already stated, the material facts can scarcely be said to be in substantial dispute. Main street and the several street crossings over Main street and Front and Second streets at the points where they cross the defined route are being regularly used by defendant for yard purposes. Indeed, the officers of defendant have testified that it is impos-

sible for the road to efficiently handle the freight which comes to it without regularly using Main street and the several streets crossing Main street at the crossings to make up and break up its freight trains. This necessity appears primarily to arise from the circumstance that the terminal grounds of defendant at Coopers Point are too small and are illy shaped to meet present needs, and from the further circumstance that a great amount of freight goes to and comes from large factories located along what is referred to as a belt line, which line approaches the terminal grounds of defendant at Coopers Point at right angles to the general direction of its system of freight tracks as now located in that yard; but be the cause what it may, it is reasonably clear that with its present yard facilities at its Coopers Point terminal defendant cannot efficiently handle the freight which comes to it without using Main street as essentially a part of its terminal yard; and in using Main street for drilling purposes to make up and break up its freight trains it necessarily obstructs the various street crossings over Main street for varying periods of time and interferes with public travel to a degree that would not otherwise occur. This drilling of freight trains on the street also necessarily occasions a great amount of soot, cinders, smoke and noise that would not otherwise occur, and creates conditions that render residence in the vicinity of Main street with a reasonable degree of comfort impossible. The evidence discloses that the defendant has exercised every possible care to avoid these annoyances to the public. It endeavors to obstruct street crossings to the least practicable degree and to create the least possible discomfort to the public; but the troublesome fact remains that Main street cannot be used to make up and break up freight trains without injury to the public which would not arise if that work should be performed elsewhere.

Complainant is entitled to relief. Complainant is entitled to require defendant to discontinue the use of Main street and its several street crossings for making up and breaking up its freight trains. On the other hand it is a matter of great public interest that the business houses on the line of

defendant's railway should be efficiently served, and that cannot be done if defendant is required to discontinue its present use of Main street immediately. In such circumstances courts of equity are privileged to define complainant's rights and insure their observance at the earliest practicable time, and to that end ascertain and fix that time.

I will award a hearing, on notice to be given by complainant, to fix a future date on which the present methods of operation by defendant shall be terminated. Evidence will at that hearing be entertained on the single inquiry as to the earliest time at which it will be possible for defendant to comply with an order to cease the operations complained of with the least injury to its public service. If it appears that defendant cannot remedy present conditions if allowed a reasonable time for that purpose an injunction must issue at once.